IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:22-CV-0001

| | | |
|---|---|---|
| MATTHEW ROBERT PAGAN,<br><br>Plaintiff,<br><br>v.<br><br>EDWARD J. MCMAHON, Sheriff of New Hanover County, in his official and individual capacities, et al.<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **ORDER** |

This cause comes before the Court on defendants' motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure [DE 132; DE 134]. The Court also considers defendants' motion to seal [DE 138] and plaintiff's corrected motion for sanctions [DE 142]. The parties have filed the appropriate responses and replies, or the time for doing so has expired. The motions are ripe for disposition. For following reasons, the Court GRANTS defendants' motions for summary judgment [DE 132; DE 134]; the Court GRANTS defendants' motion to seal [DE 138]; and the Court DENIES AS MOOT plaintiff's corrected motion for sanctions [DE 142].

## I. PROCEDURAL HISTORY

Plaintiff commenced this action by filing a complaint in this Court on December 23, 2021, alleging claims federal and state law claims [DE 1]. The causes of action arose from incidents that occurred during his pretrial detention at the New Hanover County Detention Center, where he engaged in psychosis-induced self-harm.

On April 18, 2022, plaintiff filed an amended complaint [DE 14]. On July 18, 2023, plaintiff filed a second amended complaint [DE 74]. On May 9, 2024, plaintiff filed a third amended complaint [DE 96]. Plaintiff's third amended complaint alleges eight causes of action, most of which are brought pursuant to 42 U.S.C. § 1983. Those claims are: violation of due process; deprivation of rights; excessive force and cruel and unusual punishment; Monell; negligent training, supervision, and retention; supervisory liability; North Carolina state law violations; and finally, violation of § 202 of the Americans with Disabilities Act. Defendants filed answers to the third amended complaint on May 22 and 23, 2024 [DE 113; DE 114].

On October 29, 2025, defendants filed a motion to seal exhibits that contained confidential information regarding plaintiff, including his medical records [DE 138]. Also on October 29, 2025, defendant Jail Employees John and Jane Does 1-10 and Sheriff Edward J. McMahon filed a motion for summary judgment [DE 132]. On the same day, seventeen other defendants also filed a motion for summary judgment [DE 134]. On October 30, 2025, plaintiff filed a corrected motion for sanctions regarding defendants' spoilation of evidence [DE 142]. On November 5, 2025, defendants jointly filed a statement of material facts regarding both motions for summary judgment [DE 146].

On December 10, 2025, plaintiff filed a "notice of . . . memorandum in opposition to defendants' motion[s] for summary judgment" [DE 151] and "plaintiff's memorandum of law in opposition to defendants' motions for summary judgment" [DE 152]. On the same day, plaintiff also filed his responses to defendants' statement of material facts [DE 153]. The next day, plaintiff filed a counterstatement of material facts [DE 154] and an appendix to the statement of material facts [DE 155]. On December 19, 2025, defendants jointly filed a reply [DE 156].

On March 13, 2026, this case was reassigned from United States District Judge Louise Wood Flanagan to the undersigned. [DE 159]. On May 5, 2026, the Court held a hearing before the undersigned in Greenville, North Carolina, on the matter of summary judgment. *See* [DE 161; DE 162].

At this time and in this posture of defendants' motions for summary judgment, twenty-eight defendants remain: Sheriff Edward J. McMahon, Officer C. Woods, Lt. Wilson, Sgt. Braxley, Sgt. Griswold, Sgt. Bratton. Sgt. Redmond, Cpl. Hess, Cpl. Williams, D.O. Avant, D.O. Biondo, D.O. Flaverney, D.O. Overton, D.O. Paranto, D.O. Knowles, D.O. Unger, D.O. Mull, D.O. Meadows, and Jail Employees John & Jane Does 1-10. All other defendants were terminated from the suit at points prior to the disposition of this motion.

## II. FACTUAL BACKGROUND

The following facts appear to be undisputed, unless otherwise indicated. *See* [DE 146; DE 153; DE 154; DE 155].

### A. Intake Process

On September 27, 2020, officers arrested plaintiff after he, in a paranoid and deluded state, led them on a high-speed chase through downtown Wilmington. Around 3:00 A.M. on September 28, 2020, officers transported plaintiff to the New Hanover County Detention Center ("NHCDC").

At that time, NHCDC was in contract with a medical provider called "Wellpath", which provided medication management, medical intake screenings, medical checks, and mental health services for NHCDC detainees twenty-four hours a day. After plaintiff arrived at NHCDC, Wellpath confiscated two prescription medications from him in accordance with their normal protocol for new inmates. Wellpath also conducted a medical intake screening of plaintiff, during which time he was uncooperative and refused to answer questions. As a result, medical staff could

not complete plaintiff's intake evaluation. However, medical staff completed a report regarding their interaction with plaintiff. In the report, staff noted plaintiff was acting strange. Staff also noted that plaintiff said he had narcolepsy and was taking medication for it. *See* [DE 137-2].

Because plaintiff did not answer questions during the medical screening process, a licensed nurse elected to place him on "suicide watch," [DE 153] at 4–5, [DE 156-3] at 5, which mandates a heightened monitoring protocol and pauses the detainee's medical intake evaluation until the detainee becomes sufficiently coherent and responsive. *See* [DE 135-29] at 20, 25–26; [DE 135-38] at 13–14; *see also* 10 NCAC 14J .0601.

B. <u>Officers Struggle with Plaintiff</u>

Deputies Coupee, Adams, and White escorted plaintiff to the "changeout room." There, they directed plaintiff to undress, so that he could be clothed in the "suicide gown". *See* [Sheriff's Exhibit 13] "Fast Track Video (1)" at 0:01:00. However, plaintiff attempted to dash past the officers towards the exit. He was not successful. He ran into Deputy Adams, and immediately, a struggle ensued. The three officers wrestled with and attempted to subdue him. Once plaintiff was on the ground, one officer used a taser in drive-stun mode, after which point plaintiff stopped struggling and the officers were able to put him in handcuffs. *Id.* The struggle with plaintiff seriously injured Deputy Adams. [DE 155-5] at 20, p. 76; [DE 155-9] at 17, pp 63–64.

Once plaintiff was handcuffed, officers elected to manage plaintiff via "fast track" procedure, whereby the booking process is paused until the detainee has calmed down. Officers alerted Wellpath medical staff to plaintiff's fast track, and Wellpath filed a mental health referral.

To implement suicide watch protocol, officers prepared to remove plaintiff's clothes so that they could dress him in a "suicide gown." In order to do so, they struggled to drag plaintiff, who was fiercely resisting, into a holding cell. *See* [Sheriff's Exhibit 14] "Fast Track Video (2)"

at 0:03:30-0:04:00. Once inside that cell, officers began attempting to undress plaintiff, but he continually and erratically resisted. *Id.* at 0:04:00-10:00. During the struggle, an officer struck plaintiff in the face with an open hand. [DE 154] at 3.

C. Wellpath's Medical Checks of Plaintiff

Eventually, the officers were able to undress plaintiff and put him in a suicide gown. Officers then wheeled plaintiff by restraint chair to the suicide-prevention unit. There, medical staff assessed him and noted a small abrasion on the right side of his forehead.

While plaintiff was on suicide watch, medical staff did not physically enter plaintiff's cell due to safety concerns regarding plaintiff's erratic behavior, but they periodically observed and evaluated him through his cell window.[1] *See* [DE 153] at 8–10; [DE 155-9] "Deposition of Sgt. Hess" at 59, pp. 229–232.

On September 28, 2020, Wellpath medical staff visited plaintiff's cell on a mental health referral. [DE 153] at 8–9. Wellpath's medical report in evidence shows a recording time of 2:47

---

1 Plaintiff contends that inmates on "fast track," such as plaintiff, receive no medical care as a matter of policy. [DE 154] at 4, ¶ 26. He thoroughly relies on this contention throughout his arguments. But the contention seems to be based on a misconstruction or misunderstanding of the evidence plaintiff cites. None of the cited testimony proffered by plaintiff supports it.

For instance, plaintiff cites a portion of Sheriff McMahon's deposition. In that portion, McMahon testified that inmates who can't or won't complete the medical intake evaluation are put on "fast track"—i.e., put somewhere safe until they sober up or calm down and can continue the booking process. [DE 155-3] at 23, pp. 87–88. He explained: until they calm down, medical staff can't complete the inmate's intake evaluation. *Id.* at 24, pp. 89–92. But that testimony does not support plaintiff's contention.

Plaintiff also cites a portion of Lieutenant Wilson's deposition. In that portion, Wilson agreed that when an inmate is erratic, medical cannot finish their intake evaluation of the inmate. [DE 155-5] at 26, pp. 97–98. Wilson then explained that detention officers and medical staff work together to determine when it is safe to give erratic inmates oral medication. [DE 155-5] at 26, pp. 98–100. Specifically, he testified that they generally do not give pills to inmates who are "still belligerent" and might "throw it on the floor". *Id.* But that testimony does not support plaintiff's contention, either.

Lastly, plaintiff cites a portion of Deputy Flaverney's deposition. In that portion, Flaverney was asked if detention officers in the suicide watch unit "ever provide[d] medication to the inmates incarcerated there[.]" Flaverney responded, "No. That's why we have Medical. Medical comes down and provides everybody with the medicine that they['re] supposed to have." [DE 155-6] at 43, p. 165. He then elaborated about how it is medical's job to administer an inmate's medication, though inmates are generally not given medication until their medical history is able to be ascertained through completing the medical intake evaluation. *Id.* at 43–45. *See also* [DE 135-38] at 17. But this testimony does not support plaintiff's contention, either.

P.M. [DE 136-3]. In the report, staff recorded that plaintiff was "standing naked in his cell and would not respond to verbal directives." (Plaintiff had removed his suicide gown.) Staff also indicated plaintiff had a history of using the illegal drug PCP. *Id.* Additionally, staff noted plaintiff was displaying "symptoms of unknown substance induced psychosis." Lastly, staff noted to follow-up with him the next day.

The next day, September 29, 2020, Wellpath medical staff performed another evaluation of plaintiff. *See* [DE 136-4]; [DE 153] at 8–10; [DE 155-9] at 60, p. 235. A medical note recorded at 1:25 P.M., reads: "Unable to see [plaintiff] due to severe behavioral disturbances and being combative. Patient remains intoxicated and unpredictable." [DE 136-4]. Ultimately, Wellpath staff made the decision to keep plaintiff on suicide watch. *Id.*; [DE 153] at 8–9.

Plaintiff contends that Wellpath was wrong in both reports—that he has never used PCP, and that he was not intoxicated during his detention, but that he was experiencing a mental health crisis characterized by psychosis. [DE 153] at 9. Defendants do not dispute plaintiff's contention but assert that Wellpath nevertheless believed plaintiff was intoxicated. [DE 156] at 4.

During plaintiff's detention, Wellpath staff did not prescribe or administer any medications to plaintiff, nor did they recommend any out-patient services for him.

D. Plaintiff's Harms Himself

While plaintiff was on suicide watch, officers performed security rounds and checked on him every twelve to fifteen minutes. [DE 135-15] at 1–3; [DE 135-17] at 2, ¶ 4; *id.* at 5, ¶¶ 5–6; *id.* at 11, ¶¶ 6–7; [DE 135-19] "Plaintiff's Deposition" at 4, 6; [DE 135-38] at 12–14; [DE 153] at 10–11; [DE 155-6] at 42–43. In total, officers observed plaintiff 188 times during his placement in suicide watch. [DE 135-16] at 1–3; [DE 135-38] at 13; [DE 153] at 10–11.

Plaintiff's version of the events which occurred on September 29, 2020, is as follows.[2] While in his cell, plaintiff was experiencing a mental health crisis exhibited by kicking, banging, and screaming. [DE 154] at 5, ¶ 32. Officers blocked plaintiff's cell window with a magnet, which is NHCDC policy for erratic inmates. They mocked and goaded him. *Id.* at ¶ 34; [DE 135-19] at 6; [DE 155-3] "Deposition of Sheriff McMahon" at 48, pp. 187–188; *id.* at 49, pp. 189–190. Due to the failure to provide him with his narcolepsy medication, he had not slept for 37 hours. [DE 154] at 5, ¶ 38. The lack of sleep exacerbated his psychosis. *Id.* In his psychotic state, plaintiff began to believe there was "technology" inside his eye that he needed to remove. *Id.* at 5, ¶ 39. Ultimately, plaintiff struck himself in the face and "work[ed] on" his eye for at least an hour until he was extracted from his cell. [DE 154] at 7, ¶ 57.

Defendants' account of the events before plaintiff was extracted is as follows. On September 29, 2020, officers were performing rounds and checking on plaintiff every twelve to fifteen minutes. [DE 135-15] at 1–3; [DE 135-16] at 1–3; [DE 135-17] at 2, ¶ 4; *id.* at 5, ¶¶ 5–6; *id.* at 11, ¶¶ 6–7; [DE 135-19] "Plaintiff's Deposition" at 4, 6; [DE 135-38] at 12–14; [DE 153] at 10–11; [DE 155-6] at 42–43. At 2:12 P.M., Deputy Flaverney performed a security round and did not notice anything unusual happening in plaintiff's cell. [DE 135-18] at pp. 12–13; [DE 153] at 11, ¶ 18; [DE 155-6] at 66, pp. 257–58. However, sometime between 2:15 to 2:19 P.M., Flaverney discovered plaintiff harming himself. [DE 153] at 11, ¶ 18; *see also* [DE 155-6] at 67–69. Upon this discovery, Deputy Flaverney immediately went for help and notified his supervisors. [DE 146] at 5, ¶ 19–20; *see also* [DE 155-6] "Deposition of Flaverney" at 67–68.

It is undisputed that, by this point in time, the officers in the suicide watch unit were aware plaintiff was combative, a former Marine, a former collegiate wrestler, and that he had caused

---

[2] Plaintiff's version of these events is primarily supported by portions of his own deposition, which is missing from his submitted exhibits.

injury to an officer the previous day. [DE 153] at 12–13; *see also* [DE 135-17] at 11, ¶ 3; *id.* at 15, ¶ 4; *id.* at 19, ¶ 4; *id.* at 32, ¶ 5; [DE 135-36] at 2, ¶ 4; [DE 155-5] at 20, p. 76; *id.* at 22, p. 83; [DE 155-9] at 39–42; [DE 155-11] at 53.)

E. <u>Bodycam Footage of Plaintiff's Self-Harm and Officers' Entry</u>

A video in evidence shows the events that occurred after 2:19 P.M. on September 29, 2020: Deputy Flaverney, Sargeant Baxley, and Corporal Hess enter the suicide-prevention unit. At 2:19:33 P.M., Sargeant Baxley attempts to capture plaintiff's attention through the cell window. [Individuals' Exhibit 19] at 0:00:33. Plaintiff mounts some cell furniture and swipes at the ceiling. Sargeant Baxley begins verbally processing: "What…" Plaintiff's hands and face appear bloody. A few seconds pass. Baxley remarks, "Oh man, his eyes are *puffed* up." Plaintiff lays down on the floor and harms his eyes. At 2:19:59 P.M., Baxley continues, "He's digging his thumbs in his eyes, man." At 2:20 P.M., instructions are given to secure the other inmates in the unit. Radio traffic can be heard calling for backup. Sargeant Baxley gives the call sign for all officers to respond to the suicide unit. *See also* [DE 155-6] at 53, pp. 207–08. At 2:20:14 P.M., Sargeant Baxley radios, "We got a small situation we need to handle soon." Plaintiff is digging at his eyes with his hands.

While waiting for back up, Sargeant Baxley tries repeatedly to capture plaintiff's attention by calling his name and tapping on plaintiff's cell window. By 2:20:27 P.M., plaintiff's face is visibly covered in blood as he continues working at his eyes.

(It is undisputed that, during these minutes, Corporal Hess was devising a plan to make entry into plaintiff's cell and determining what equipment would be needed. [DE 153] at 12–13.)

At 2:20:55 P.M., a voice says, "He's gouging his eyeballs out." At 2:21:08 P.M., Sargeant Baxley says, "He's – he's bloody man. He's digging his thumbs and stuff in his eyes and it looks like he's pulling flesh off his face." By this point, more officers have gathered outside of plaintiff's

cell. At 2:21:34, Sargeant Baxley again attempts to get plaintiff's attention while waiting for more back up. At 2:21:53, a voice says "Medical's en route."

Lieutenant Wilson then enters the suicide-prevention unit. At 2:22:10 P.M., Sargeant Baxley walks across the floor to brief him on the situation. Together, they walk to plaintiff's cell door, where four other officers are waiting to make entry. At 2:22:21 P.M., Sargeant Baxley opines, "We need a shield… we need… more than likely a restraint chair." At 2:22:36, Lieutenant Wilson is finally able to peer through plaintiff's cell window, and immediately says, "No. No! Open this door! Open this door!" Without a shield, Lieutenant Wilson enters plaintiff's cell at 2:22:42 P.M., where plaintiff is laying on his back, and Lieutenant Wilson starts trying to get plaintiff to roll over onto his stomach. Other officers follow.

Immediately, plaintiff becomes violent. He thrashes wildly. He kicks and scratches Officer Biondo in the face and grabs Officer Meadow's clothing around his neck. Deputy Avant strikes plaintiff twice to get him to release Officer Meadows. Lieutenant Wilson lifts plaintiff off the ground by his neck in a chokehold, but plaintiff continues fighting. In this way, plaintiff is dragged out of his cell, still trying to strike officers, and in fact a flurry of his blows can be heard landing.

Once he is brought outside his cell, Sargeant Baxley deploys a taser on plaintiff, who is consequently brought to the ground. Officers continue their attempts to restrain plaintiff while he continues resisting. Sargeant Baxley utilizes the taser a second time. (Plaintiff asserts that at the time of the taser's second deployment, plaintiff was already in handcuffs and shackles. [DE 153] at 14, ¶ 25.) The officers eventually succeed in placing plaintiff in a restraint chair.

F. <u>Medical Response</u>

By the time plaintiff was extracted from his cell, he had completely gouged out his own left eye. Once he was safely restrained, medical staff administered aid to him. Emergency medical

services then arrived, and officers moved plaintiff from the restraint chair onto a gurney for transport to the hospital. At the hospital, plaintiff was assessed with psychosis, a left lid laceration, an orbital floor open fracture, a conjunctival abrasion, and delusional disorder. Doctors were unable to save plaintiff's left eye.

## III. LEGAL STANDARD

A motion for summary judgment may not be granted unless there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether a genuine issue of material fact exists for trial, a trial court views the evidence and the inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's position is not sufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotation marks and citations omitted). Speculative or conclusory allegations will not suffice. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

"As a general rule, when one party files a motion for summary judgment, the non-movant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion." *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). Moreover, in this district, Local Civil Rule 56.1 requires that any motion for summary judgment must be supported by a separate statement of facts which the movant contends are undisputed. Local Civil Rule

56.1(a)(1). The rule further requires that "[t]he memorandum opposing a motion for summary judgment shall be supported by a separate statement that includes a response to each numbered paragraph in the movant's statement" of material facts and that "[e]ach numbered paragraph in the movant's statement of material facts will be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement." Local Civil Rule 56.1(a)(2).

## IV. DISCUSSION

Defendants seek summary judgment on all of plaintiff's claims as alleged in the third amended complaint. *See* [DE 96].

As an initial matter, plaintiff's response does not address defendants' arguments pertaining to his claims for state law violations, cruel and unusual punishment, supervisory liability, or violation of the ADA. If a moving party files a motion for summary judgement based on a legal theory in the plaintiff's complaint, and the opposing party "fail[s] to address the arguments presented by [the moving party]," the opposing party "therefore appears to concede that summary judgment is appropriate[.]" *See, e.g.*, *Kettle v. Leonard*, No. 7:11-CV-189-BR, 2012 WL 4086595, at *5 (E.D.N.C. Sept. 17, 2012). Failing to address a movant's arguments amounts to "an outright failure to join in the adversarial process [and] . . . ordinarily result[s] in waiver." *Alvarez v. Lynch*, 828 F.3d 288, 295 (4th Cir. 2016) (citations omitted). Therefore, plaintiff has conceded to summary judgment on these claims.

Additionally, plaintiff's memorandum in opposition to summary judgment exceeds the allowable page limit. *See* [DE 152]. For that reason, defendants urge the Court to strike it. *See* [DE 156] at 2. The Local Civil Rules specify that a memorandum "in support of or in opposition to a motion (other than a discovery motion) shall not exceed 30 pages in length." Local Civil Rule

7.2(f)(2)(A). Excluding the caption, table of contents, and signature page, plaintiff's memorandum is seventy-four (74) pages. However, on December 30, 2025, United States District Judge Louise W. Flanagan ordered that plaintiff "may file a single Memorandum of Law in Opposition to both pending Motions for Summary Judgment . . . not to exceed 60 pages in length." Accordingly, the Court will disregard as abandoned arguments following page 60 of plaintiff's memorandum [DE 152].[3] These include plaintiff's arguments regarding his fifth cause of action: "negligent training, supervision and retention". Therefore, this claim will not be considered by the Court. *See, e.g.*, *Johnson v. Allen*, No. 7:18-CV-14-D, 2019 WL 11316660, at *1 (E.D.N.C. Apr. 25, 2019) (granting motion to strike a memoranda that far exceeded the authorized page limit), *aff'd*, 784 Fed. App'x 165 (4th Cir. 2019); *Zelaya v. A+ Tires, Brakes, Lubes, and Mufflers, Inc.*, No. 5:13-CV-00810-F, 2017 WL 464375 (E.D.N.C. Feb. 2, 2017) (granting motion to strike plaintiff's second motion for partial summary judgment when filed in apparent attempt to avoid page limitation); *Reliastar Life Ins. Co. v. Laschkewitsch*, No. 5:13-CV-210-BO, 2014 WL 2211033, at *2 (E.D.N.C. May 28, 2014) ("Ignorance of the rules is no excuse . . . .") (declining to consider a *pro se* plaintiff's arguments following the last page of the allowable 30-page limit). Thus, plaintiff's fifth cause of action has also been abandoned.

Plaintiff's remaining causes of action before the Court are as follows: (1) violation of Due Process against all defendants; (2) deprivation of rights, against all defendants; (3) excessive force, against individually named defendants; and (4) *Monell*, against Defendant Sheriff McMahon.

A. <u>Qualified Immunity</u>

Defendants have raised the defense of qualified immunity as to all § 1983 claims against them in their individual capacities. Qualified immunity shields government officials from liability

---

[3] The 60th page of plaintiff's memorandum is marked as "Page 63 of 78".

for statutory or constitutional violations so long as the officials can reasonably believe that their conduct does not violate clearly established law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Where qualified immunity has been raised, viewing the facts and drawing the reasonable inferences in the light most favorable to the plaintiff generally means adopting the plaintiff's version of the facts. *Scott*, 550 U.S. at 378; *see also Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). A court "do[es] not make credibility determinations in resolving the first prong of the [qualified immunity] analysis." *Wilson v. Prince George's Cty., Maryland*, 893 F.3d 213, 220 (4th Cir. 2018). However, a court need not adopt plaintiff's version of a fact when that fact is discredited by a videotape of undisputed authenticity. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

A court employs a two-step procedure for determining whether qualified immunity applies that first asks whether a constitutional violation occurred *Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010). A court must identify the specific rights the plaintiff alleges were violated at "a high level of particularity." *Edwards v. City of Goldsboro*, 178 F.3d 231, 250–51 (4th Cir. 1999). Second, the Court must ask whether the right violated was clearly established. *Id.* A right is clearly established if, "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal quotations and citation omitted). A clearly established right requires existing precedent which places "the statutory or constitutional question beyond

debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (noting that a case on point is not required). A court considers both rights that have been specifically adjudicated as well as "those manifestly included within more general applications of the core constitutional principles invoked." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017) (citation omitted). The right need not be defined "in accordance with the very actions in question." *Tarashuk v. Givens*, 53 F.4th 154, 164 (4th Cir. 2022) (cleaned up, citation omitted).

### B. Plaintiff's First and Second Causes of Action: Violation of Due Process

Defendants seek summary judgment on plaintiff's first and second causes of action. Plaintiff's first cause of action is captioned "Violation of Due Process under 42 U.S.C. § 1983", in which he alleges that named officers violated his Fifth and Fourteenth Amendment rights in showing deliberate indifference to his medical needs and in failing to protect him from harm. [DE 96] at 28–29. Plaintiff's second cause of action is captioned "Deprivation of Rights Under 42 § 1983," in which he alleges the same named officers, pursuant to the same actions, "deprived the plaintiff of his rights" guaranteed under the Fifth and Fourteenth Amendments. Although plaintiff alleges these causes of action separately, they are virtually the same—brought pursuant to the same statute, regarding the same two amendments, against the same defendants, based on the same conduct. Therefore, the Court treats plaintiff's first and second cause of action as one: violation of due process pursuant to Section 1983.

To state a claim under Section 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see also Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *N. Carolina All. for Retired Ams. v. Hirsch*, 741 F. Supp. 3d 318, 334 (E.D.N.C. July 19, 2024).

Here, plaintiff has alleged that defendants who are state actors violated his Fifth and Fourteenth Amendment rights by (1) showing deliberate indifference to his medical needs as a pre-trial detainee, and by (2) failing to protect him from self-harm. [DE 96] at 28–29.

The Due Process Clause of the Fifth Amendment only pertains to federal action. *See Dusenbery v. U.S.*, 534 U.S. 161, 167 (2002). Because defendants are state actors of North Carolina, plaintiff's claims fail under the Fifth Amendment but proceed via the Fourteenth.

The Due Process Clause of the Fourteenth Amendment prohibits any state from depriving a person of "life, liberty, or property, without due process of law[.]" U.S. CONST. amend. XIV, § 1. It "protects pretrial detainees from 'governmental action' that is not 'rationally related to a legitimate nonpunitive governmental purpose' or that is 'excessive in relation to that purpose.' " *Short v. Hartman*, 87 F.4th 593, 608–09 (4th Cir. 2023) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015) (quoting *Bell v. Wolfish*, 441 U.S. 520, 561 (1979))). "That test is solely an objective one." *Short*, 87 F.4th at 609 (citations and quotation marks omitted). "The Supreme Court has recognized that an objective test requires civil recklessness, observing that 'civil law generally calls a person *reckless* who acts or (if the person has a duty to act) *fails to act* in the face of an unjustifiably high risk of harm that is either known or *so obvious that it should be known*.' " *Id.* at 611 (emphases in original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 836–37 (1994)).

1. Deliberate Indifference to a Medical Need

To state a claim for deliberate indifference to a medical need,

> a pretrial detainee must plead that (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

*Short*, 87 F.4th at 611.

There is no dispute that plaintiff had a medical condition—i.e., psychosis and delusional disorder—that posed a substantial risk of serious harm. Furthermore, the evidence shows that plaintiff's psychosis was obvious to the officers. *See* [DE 135-17] at 8, ¶ 4; *id.* at 11, ¶¶ 5-8; [DE 154] at 2, ¶¶ 12-13; *id.* at 5, ¶¶ 32-37; *id.* at 6, ¶ 40; [DE 155-5] at 22, pp. 83–84; *id.* at 23, pp. 85–85. Some officers guessed the plaintiff was intoxicated and some guessed he was mentally "off", though they did not have the specialized medical training to recognize the difference. *See* [DE 135-17] at 5, ¶ 10; [DE 135-29] at 34–35; [DE 135-39] at 7; [DE 135-46] at 3; [DE 155-2] at 35–36; [DE 154] at 6, ¶ 40; [DE 155-5] at 22, pp. 83:18–84:23. The officers were clearly instructed by trained medical professionals to place plaintiff on suicide watch, which Lieutenant Wilson testified "heightens the awareness of the officer to look out for self-harm." *See* [DE 155-5] at 23, p. 87. Thus, the officers knew that plaintiff was a danger to himself due to his mental condition.

The next question is whether defendants intentionally, knowingly, or recklessly failed to address plaintiff's risk of self-harm. *See Short*, 87 F.4th at 611. To that end, plaintiff explicitly claims that the officers prevented him from receiving any medical care whatsoever while he was at the detention center. [DE 152] at 40–41. But the record overwhelmingly shows otherwise.

As part of the intake process, officers took plaintiff to be medically screened by Wellpath staff, who were trained to evaluate mental health. *See* [DE 153] at 3–5; [DE 155-1] at 40, at 154:14-23; [DE 155-2] at 34, pp. 131–32; [DE 155-5] at 24, p. 92. Due to his uncooperative behavior, Wellpath nurses decided to place him on "suicide watch." After plaintiff fought with officers, the officers had medical evaluate plaintiff again (and medical noted a small abrasion). [DE 153] at 7, ¶ 12. While plaintiff was on suicide watch, Wellpath staff visited and evaluated him once on September 28, and once on September 29, 2020. [DE 136-3]; [DE 136-4]; [DE 153] at 8–10; [DE 155-9] at 60, p. 235.

Even so, plaintiff cites *Short*, 87 F.4th at 614, in arguing that "[o]fficers cannot shield themselves from liability merely because medical personnel were consulted at some point." [DE 152] at 38. In *Short*, medical staff evaluated the plaintiff and instructed officers to implement the jail's withdrawal protocol for her. *Short*, 87 F.4th at 600. The officers did not comply with the protocol's monitoring requirements. *Id.* Eventually, the officers became aware that the plaintiff was suicidal, *id.* at 599–601, and at least one ignored protocol to refer her for a mental health evaluation. *Id.* at 600. The officers also failed to follow the monitoring protocol for suicidal inmates. *Id.* at 601. Lastly, officers put the plaintiff in an isolated cell for being "mouthy"—a choice which had nothing to do with medical judgment. *Id.* at 601, 614. There, the plaintiff committed suicide. *Short*, 87 F.4th at 601. Although the officers argued they were entitled to defer to medical's initial professional judgments that the plaintiff did not pose a suicide risk, the Fourth Circuit held the officers could not use the medical defendants' conduct or failure to act as a shield from liability for the officers' decisions, especially their decisions not to follow protocol. *Id.* at 614–15.

The undisputed facts of this case are easily distinguishable. Here, the officers complied with suicide watch protocol. *See* [DE 135-38] at 13; [DE 135-40] at 11, p. 172:11-25; *id.* at 12, p. 173:2-25. While plaintiff was in his cell, detention officers conducted a total of 188 security checks of his cell, with an average rotation of approximately five or six security checks per hour—exceeding the state requirement of four checks per hour for inmates on special watch. *See* [DE 135-15] at 1–3; [DE 135-16] at 1–3; [DE 135-17] at 2, ¶ 4; *id.* at 5, ¶¶ 5–6; *id.* at 11, ¶¶ 6–7; [DE 135-19] "Plaintiff's Deposition" at 4, 6; [DE 135-38] at 12–14; [DE 153] at 10–11; [DE 155-6] at 42–43.

Even though plaintiff does not dispute that the detention officers completed security rounds and observed him from his cell window (in fact, he testified that they did—*see* [DE 135-19] "Plaintiff's Deposition" at 4–6), nor does he dispute that they complied with suicide watch monitoring requirements, he alleges a single fact that seems to contradict what all the rest of the evidence shows. That is, he alleges that he was "striking himself in the face and 'working on' his eye for at least an hour before he was extracted from his cell." [DE 154] at 7, ¶ 57. In support of that timeline, plaintiff cites two pieces of evidence: his own deposition and the deposition of Officer Flaverney.

Unfortunately, plaintiff's counsel did not submit plaintiff's deposition.[4] However, the Court will credit the plaintiff's testimony as if it were properly submitted and assume that plaintiff testified he was hitting his own face and "working on" his eye for at least an hour in total before officers extracted him from his cell.

In plaintiff's cited portion of Flaverney's deposition, Flaverney testified that he observed plaintiff punching himself "before" entry into plaintiff cell at 2:22 P.M.[5] [DE 155-6] at 60, pp. 233–34. But that much is obvious and it does not specifically support an inference that Flaverney observed plaintiff harming himself any time before 2:15 P.M. In fact, Flaverney testified in detail that on September 29, 2020, he observed plaintiff every twelve to fifteen minutes. *See* [DE 155-6] at 27, p. 104; *id.* at 30, p. 116; *id.* at 31–36; *id.* at 42–43, pp. 163–65; *id.* at 65, p. 253. When he performed a security round at 2:12 P.M., "nothing [ ] was going on with [plaintiff]". [DE 155-6] at 66, pp. 257–58. It was not until sometime between 2:15 and 2:19 P.M. that he observed plaintiff harming himself. [DE 155-6] at 67–69.

---

4 It appears counsel for plaintiff mistakenly submitted an officer's deposition in its place. *See* [DE 155-1].

5 The bodycam footage shows a time of 4:22 P.M., but there is a consensus between the parties that the video clock was off by two hours. *See* [DE 155-6] at 60, p. 236.

In conducting a review of the record, there is no other evidence that directly supports plaintiff's testimony that he was harming himself for one hour before he was extracted. Moreover, plaintiff does not allege that any officers noticed or ignored plaintiff hurting himself before 2:15 P.M. He does not allege that he was visibly bleeding before 2:15 P.M. Therefore, the Court regards plaintiff's testimony about the one hour time frame as a "scintilla" of evidence—the likes of which, standing alone, cannot defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 252.

Even if the Court takes plaintiff's testimony and defendants' undisputed facts as true, the factual scenario presented to the Court is one in which plaintiff was able to ambiguously "work" at his eye in some unspecified capacity and punch himself at some unspecified frequency for at least an hour before the officers, who complied with protocol, noticed or understood what was happening and stopped him. Without more, that does not amount to an intentional, knowing, or reckless failure to act on the part of defendants. Accordingly, plaintiff has not shown that defendants were deliberately indifferent, and defendants are entitled to summary judgment on this claim.

2. Failure to Intervene or Protect

Plaintiff's failure to intervene or protect is essentially another deliberate indifference claim, but it concerns the time that it took for officers to physically enter his cell after they witnessed him self-harm at some point between 2:15 and 2:19 P.M. on September 29, 2020.

The Due Process Clause ensures that pre-trial detainees have a right to be protected from physical harm at least as much as convicted prisoners do under the Eighth Amendment. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). "Through its prohibition of cruel and unusual punishments, the Eighth Amendment 'places restraints on prison officials' and imposes an obligation upon them to 'take reasonable measures to guarantee the safety of' incarcerated

individuals." *Case v. Beasley*, 167 F.4th 651, 659 (4th Cir. 2026) (quoting *Farmer*, 511 U.S. at 832). "[P]rison officials violate the Eighth Amendment when they act with deliberate indifference to a substantial risk of serious harm to an incarcerated individual." *Beasley*, 167 F.4th at 656.

The Fourth Circuit has recognized that the duty to protect prisoners extends to protection from self-inflicted harm. *Lee v. Downs*, 641 F.2d 1117, 1121 (4th Cir. 1981).

"To prevail on an Eighth Amendment claim for failure to protect, an incarcerated individual must satisfy two requirements: first, he must show that the deprivation he suffered was objectively sufficiently serious; and second, he must establish that the defendant had a sufficiently culpable subjective state of mind." *Beasley*, 167 F.4th at 659 (quoting *Cox v. Quinn*, 828 F.3d 227, 235–36 (4th Cir. 2016)). As to the first requirement, here, there can be no doubt that plaintiff suffered serious injury in gouging out his own eye. The second requirement is a showing of deliberate indifference.

> Deliberate indifference entails more than simple negligence but less than intentional harm. [A claimant] must show that genuine issues of material fact remain as to whether the [o]fficers subjectively knew of a substantial risk of serious harm but disregarded that risk by failing to take reasonable measures to abate it.

*Beasley*, 167 F.4th at 660 (internal citations and marks omitted). "Prison officials are deliberately indifferent if they are aware that 'the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so.' " *Cox*, 828 F.3d at 236 (quoting *Brown v. N.C. Dept. of Corrections*, 612 F.3d 720, 723 (4th Cir. 2010)).

As previously discussed *supra*, the first detention officers witnessed and understood for that plaintiff was engaging in self-harm at some time between 2:15 and 2:19 P.M. There can be no question that by 2:20 P.M., at least two officers—Baxley, Flaverney, and Hess—knew the harm was "serious." Therefore, the next question is whether the measures taken by the officers to mitigate the harm, once observed, were constitutionally adequate. *See Beasley*, 167 F.4th at 661.

"[A] prison official's response to a known threat to inmate safety must be reasonable." *Cox*, 828 F.3d at 236 (quoting *Farmer*, 511 U.S. at 844). However, prison guards have no constitutional duty to intervene immediately when doing so would place them in danger of physical harm. *See Winfield v. Bass*, 106 F.3d 525, 532–33 (4th Cir. 1997) (quoting *Prosser v. Ross,* 70 F.3d 1005, 1008 (8th Cir. 1995) (finding no deliberate indifference where a prison guard ran to get help immediately after an inmate threw the first punch at the plaintiff)). But "completely failing to take *any* action" to stop the ongoing harm can amount to deliberate indifference. *See Winfield,* 106 F.3d at 532 (emphasis in original); *see also, e.g., Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 773 (4th Cir. 2003) ("[A] correctional officer who stands by as a passive observer and *takes no action whatsoever* to intervene during an assault violates the [Eighth Amendment] rights of the victim inmate.") (emphasis in original); *Williams v. Mueller,* 13 F.3d 1214, 1216 (8th Cir. 1994) ("A prison official acts with deliberate indifference to an inmate's safety when the official is present at the time of an assault and fails to intervene or otherwise act to end the assault.").

After officers observed plaintiff's serious self-harm, they urgently performed many tasks in preparation for entry. They called all other officers to the suicide watch unit, they called for medical, they alerted their supervisors, they devised a plan and determined what equipment they would need, they gathered around the cell, they waited for their requested aid, and they tried to get plaintiff's attention in order to distract him by knocking on his window and calling his name.

Nevertheless, plaintiff argues that the defendant officers should have entered plaintiff's cell instantly upon observing him self-harm, instead of at 2:22 P.M. [DE 152] at 47. He further argues that Lieutenant Wilson's immediate entry into plaintiff's cell "demonstrates that entry was both feasible and safe. He entered the cell by himself, without special equipment, and was not attacked[.]" *Id.* at 48.

Indeed, the evidence shows that, upon seeing plaintiff covered in blood, Lieutenant Wilson instantly entered plaintiff's cell at 2:22 P.M.—without a shield, special equipment, or any officers ahead of him. And there is no evidence that he was injured. However, one officer's heroism does not prove that immediate intervention without additional aid was safe. *See Winfield*, 106 F.3d at 532 ("[S]uch heroic measures are not constitutionally required.").

In fact, a mountain of undisputed evidence shows the officers knew plaintiff was combative and dangerous. They knew that plaintiff had already fought with officers several times, that it had been a struggle for groups of officers to control him, that he was a former marine and collegiate wrestler, and that he had already seriously injured at least one officer. [DE 153] at 12–13; *see also* [DE 135-17] at 11, ¶ 3; *id.* at 15, ¶ 4; *id.* at 19, ¶ 4; *id.* at 32, ¶ 5; [DE 135-36] at 2, ¶ 4; [DE 155-5] at 20, p. 76; *id.* at 22, p. 83; [DE 155-9] at 39–42; [DE 155-11] at 53. Moreover, plaintiff's extreme behavior in gouging his own eye out would reasonably have informed the officers that he was capable of inflicting severe violence at that very moment.

Furthermore, the events *following* Wilson's entry prove it was dangerous. Almost immediately, plaintiff became wildly violent. The video shows it clearly: plaintiff kicked and scratched Officer Biondo in the face and grabbed Officer Meadow's clothing around his neck. Lieutenant Wilson lifted plaintiff off the ground by his neck and throat in a chokehold, but plaintiff still fought. In this way, plaintiff was dragged out of his cell while still trying to strike officers, during which a flurry of his blows can be heard.

The officers subjectively appreciated the actual danger they would face upon entry into plaintiff's cell. Under those circumstances, they reasonably acted to end the harm. Thus, the plaintiff cannot show defendants were deliberately indifferent.

### C. <u>Plaintiff's "Third Cause of Action": Excessive Force</u>

Plaintiff alleges four different instances of excessive force occurred throughout his detention. The Due Process Clause of the Fourteenth Amendment "protects a pretrial detainee from the use of excessive force that amounts to punishment," *Graham v. Connor,* 490 U.S. 386, 395 n. 10 (1989), and is not "an incident of some other legitimate governmental purpose." *Bell,* 441 U.S. at 538. A plaintiff must demonstrate "only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 397.

In determining whether the force was objectively unreasonable, a court considers the evidence from the perspective of a reasonable officer on the scene and may not employ 20/20 hindsight. *Graham,* 490 U.S. at 396–97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."). Because the test is an objective one, the Court does not consider an officer's underlying intent or motivation. *Graham*, 490 U.S. at 397. Moreover, it is appropriate to determine whether the force used was objectively reasonable in *full* context, as a segmented view of the events "misses the forest for the trees." *Smith v. Ray,* 781 F.3d 95, 101–02 (4th Cir. 2015) (citation omitted).

A court does consider, however, the facts and circumstances confronting the officer, and it must focus its attention on the moment the force was employed. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011). Specific factors to be considered are the severity of the crime at issue, whether the suspect poses an immediate threat, and whether the suspect is actively resisting or attempting to flee. *Graham*, 490 U.S. at 396. Additionally,

> [c]onsiderations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the

> security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley*, 576 U.S. at 397.

Whether the officer's conduct was reasonable is a question of law to be decided after determining "the relevant set of facts and draw[ing] all inferences in favor of the nonmoving party *to the extent supportable by the record*." *Scott*, 550 U.S. at 381 n.8 (emphasis in original).

1. Plaintiff was Tased

Plaintiff's first assignment of excessive force occurred sometime in the morning of September 28, 2020: officers used a taser in "drive-stun" mode on plaintiff. A video in evidence shows the entire event. *See* [Sheriff's Exhibit 13] "Fast Track Video (1)" at 0:01:00. Plaintiff, who is uncuffed, is instructed to undress. Suddenly, he attempts to dash past the officers towards the exit of the changeout room. Instead, plaintiff runs into a deputy and a struggle ensues. Three officers wrestle with and attempt to restrain him. The officers bring him to the ground, *see also* [DE 154] at 3, ¶14, but he does not comply with the officers' commands or stop struggling. At that point, an officer delivers a 5-second burst from a taser, using a "drive-stun" technique to effect compliance. [DE 155-2] at 20.

Pursuant to the *Kingsley* factors, the Court finds the use of the taser was not objectively unreasonable. The need to restrain plaintiff was great. He had already led police on a high-speed chase. When officers tased him, he was attempting to escape again and he had made it (the video shows) all the way to the doorway. [Sheriff's Exhibit 13] "Fast Track Video (1)" at 0:01:22. Meanwhile, he was uncuffed; he was actively resisting, even though he was already on the ground. *See* [DE 155-2] at 19–20; [DE 155-4] at 23–24, 26. Officers had already attempted to secure his compliance by verbal command, and it was difficult to secure domination over him by wrestling alone. (In the video, officers can be heard panting. [Sheriff's Exhibit 13] "Fast Track Video (1)"

at 0:02:01.) The taser burst did not injure plaintiff, but it immediately effected his compliance. Given the choice to continue struggling with plaintiff manually, or to use a taser, the taser was the safer choice for all involved. Accordingly, the officer's use of the taser was not unreasonable.

Because there was no constitutional violation, the officer who tased plaintiff is entitled to qualified immunity. *See Robinson v. Best*, 689 F. Supp. 3d 147, 163 (E.D.N.C. Aug. 30, 2023) ("Qualified immunity shields a defendant if the answer to either prong is 'no.' " (citing *al-Kidd*, 563 U.S. at 735)). Therefore, defendants are entitled to summary judgment on this excessive force claim.

2. Plaintiff was Struck

Plaintiff's second assignment of excessive force occurred very shortly after the first. *See* [DE 152] at 4, 9, 32; [DE 154] at 3, ¶¶ 17-19. A video in evidence shows the entire event. After plaintiff's escape attempt was thwarted, the video clearly shows five officers struggling to drag him into a holding cell while he is kicking and thrashing—even while handcuffed. [Sheriff's Exhibit 14] "Fast Track Video (2)" at 0:03:45-0:04:07. At least four officers struggle to roll plaintiff onto his stomach so that he can be undressed. *Id.* at 0:04:02. One officer directs plaintiff to roll while plaintiff thrashes around on the ground and refuses to cooperate. Another officer is kneeling near plaintiff's head, attempting to turn it toward the mattress on the ground. Plaintiff turns his head and body the other direction. The officer strikes with an open hand the side of plaintiff's face that is turning away from the mattress, saying, "stop!" *Id.* at 0:04:11.

Pursuant to the *Kingsley* factors, the Court finds the open-hand strike to the face was not objectively unreasonable. Officers needed to use force to change plaintiff into a protective "suicide gown" because he was a threat to himself and others. Despite already having been tased and handcuffed, he fervently and continually resisted being undressed by kicking and twisting on the

ground. In light of the need to control plaintiff, the hit was not disproportionate to the amount of force plaintiff himself was exerting to resist; it was exacted at a moment officers were actively struggling to subdue plaintiff, and he does not allege it injured him.

Furthermore, plaintiff cannot show the officer violated any clearly established right of his. He argues, citing *Estate of Jones v. City of Martinsburg, W. Va.*, 961 F.3d 661, 669 (2020), "it was clearly established in 2013 that officers may not use force against an incapacitated suspect." [DE 152] at 56. But the "incapacitated" plaintiff in *Estate of Jones* had been tased four times, hit in the brachial plexus, kicked, placed in a chokehold, was making gurgling noises, and was laying on the ground. In contrast, plaintiff was not "injured and helpless" or "unable to get up or otherwise defend himself" or "already immobilized." *See id.* at 669–70. Plaintiff was not incapacitated.

The Fourth Circuit has held "it is the [clearly established] right of a suspect who was at the very least partially subdued and posed no immediate threat to be free from excessive force in the form of strikes to his head." *Lewis v. Caraballo*, 98 F.4th 521, 537 (2024). In that case, the plaintiff was a teenager with a mental health condition whose only threat was "his somewhat erratic conduct, his failure to comply with a small number of lawful commands, and two to three instances in which he clenched his fists while the officers were far from [his] reach." *Id.* at 532 (cleaned up). At the moment the officer struck his head, the plaintiff was kneeling under the weight of two visibly larger officers, not resisting or feeling. *Id.* at 535. Yet the officer struck him five times in the head with a closed fist. *Id.* at 536. Plaintiff's case is easily distinguishable. Here, plaintiff was a young man with a mental health condition who had been a collegiate wrestler and former marine. He was handcuffed but actively kicking and resisting at least four officers when he was struck once in the head with an open hand.

A right not to be struck in the head with an open hand while actively resisting and assaulting officers has not been clearly established—even if handcuffed and suffering from a mental health condition. *See, e.g.*, *Salway v. Norris*, No. 2:20-CV-115, 2021 WL 2953668, at *5–6 (D. Wyo. July 14, 2021), *aff'd*, No. 21-8055, 2023 WL 1155868 (10th Cir. Jan. 31, 2023) (holding that a police officer striking a handcuffed suspect twice in the face did not constitute excessive force where the detainee continued kicking and screaming while detained). Therefore, defendants are entitled to qualified immunity and summary judgment on this excessive force claim.

3. Plaintiff was Punched

Plaintiff's third assignment of excessive force occurred minutes after the second: two punches in the back. *See* [DE 152] at 9, 32. A video in evidence shows plaintiff, undressed, lying prone on top of the mattress in handcuffs and shackles. [Sheriff's Exhibit 14] "Fast Track Video (2) at 0:08:00. Some officers hold plaintiff to the floor, preparing to dress him. Plaintiff taunts the officers. The officers then lift plaintiff onto the open "suicide gown" and begin to wrap him in it. One officer says, "Hey man, we need you to cooperate, alright?" Plaintiff then immediately kicks the officer with both feet. *Id.* at 0:08:34; *see also* [Individuals' Exhibit 33] at 0:08:45. Another struggle ensues. The video does not clearly depict—but the Court will assume—two punches to plaintiff's back occurred. Immediately after the punches, plaintiff stops squirming and officers regain control over him.

Pursuant to the *Kingsley* factors, the Court finds the punches to plaintiff's back were not objectively unreasonable. The level of force was evidently negligible compared to the need to control plaintiff, who did not cry out or assume injury. Moreover, the officer clearly attempted to direct plaintiff verbally before using force. Granted, at that point, the risk of plaintiff fully escaping

was very low. However, he had yet to stop thwarting the officers' attempts to restrain and control him, which was necessary for his own protection and theirs.

Plaintiff cannot show the officer violated any clearly established right of his. As this Court has already determined, "[n]o Fourth Circuit authority holds that the use of punches on a physically resisting suspect is objectively unreasonable. And a wealth of other authority points in the opposite direction." *Allen v. City of Dunn*, 708 F.Supp.3d 743, 755 (E.D.N.C. Dec. 27, 2023). Therefore, the officers are entitled to qualified immunity and summary judgment on this excessive force claim.

4. Plaintiff Tased a Final Time

Plaintiff's last assignment of excessive force occurred the next day, September 29, 2020, after he had gouged out his eye. [DE 152] at 23–26; [DE 154] at 8, ¶¶ 61-63. A video in evidence shows: officers extract plaintiff from his cell and attempt to restrain him so that he can be medically treated. *See* [Sheriff's Exhibit 23] at 0:04:00. Plaintiff is tased and brought to the ground. At that point, plaintiff is out of view, but sounds can be heard from which the reasonable jury could find that officers were in the process of putting handcuffs and shackles on him. However, before these sounds stop, *see* [Sheriff's Exhibit 23] at 0:05:04, at least four officers kneeling around plaintiff lurch toward him and one officer yells, "Hey-hey! Get some hands on him! He's gonna get it again! Tasing him again! Pulling the trigger! Watch for the wires!" The officer then tases plaintiff again—plaintiff's final assignment of excessive force.

Plaintiff contends the final tasing was excessive, because he was already in handcuffs and shackles and on the ground. However, he does not refute defendants' allegation that he continued to physically resist being held down. [DE 146] at 6, ¶ 24; [DE 153] at 13–14; [DE 133-25] at 2.

Even assuming plaintiff was already handcuffed and shackled while he was on the ground, the second tasing was not objectively unreasonable pursuant to the *Kingsley* factors. The need to prevent plaintiff from flailing—as he was one minute before—was great. He had just gouged out his own eye and was in desperate need of medical treatment, which could not be administered until he stopped resisting. The officer who tased plaintiff also gave a kind of verbal warning before plaintiff was tased a second time ("He's gonna get it again!"). Given the choice between wrestling him into submission or tasing him, the taser was the safer option because plaintiff was already injured, slippery from his own blood, and trained in wrestling. Furthermore, by that point, the responding officers had been informed that plaintiff had already seriously injured another officer. Plaintiff himself suffered no injury from the tasing, and it produced the desired effect. The officers' use of force was not objectively unreasonable.

Because there was no constitutional violation, the officer who tased plaintiff is entitled to qualified immunity. *See Robinson*, 689 F. Supp. 3d at 163 ("Qualified immunity shields a defendant if the answer to either prong is 'no.' " (citing *al-Kidd*, 563 U.S. at 735)). Accordingly, defendants are entitled to summary judgment on this excessive force claim.

### D. Plaintiff's "Fourth Cause of Action": Monell

Plaintiff asserts a Section 1983 *Monell* claim against Sheriff Edward McMahon in arguing that his "fast track" policy is facially unconstitutional.[6] Defendants move for summary judgment.

A municipality may be held liable under 42 U.S.C. § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.*,

---

[6] To the extent plaintiff's *Monell* claim is based on the violation of his Fourteenth or Eighth Amendment rights, *see* [DE 96] at 31, his claim fails because he has not shown that any such violation occurred. *See Waybright v. Frederick Cnty, MD*, 528 F.3d 199, 203 (4th Cir. 2008) ("[S]upervisors and municipalities cannot be liable under § 1983 without some predicate constitutional injury at the hands of the individual state officer.") (cleaned up).

436 U.S. 658, 694 (1978). "[P]laintiffs seeking to impose liability on a municipality must, therefore, adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999). Nonetheless, "when a municipal policy or custom is itself unconstitutional, i.e., when it directly commands or authorizes constitutional violations, the causal connection between policy and violation is manifest and does not require independent proof." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (cleaned up; citations omitted).

It is undisputed that NHCDC maintains a "fast track" policy, whereby the booking process of erratic, uncooperative, or intoxicated inmates is paused and they are put in a holding cell until such time as they calm down and can continue. However, plaintiff alleges the policy directs officers to exclude medical professionals from providing medical care, including medicine, until the detainee calms down. *See* [DE 154] at ¶¶ 24, 26, 27; *see also* [DE 152] at 5, 11–12, 61–63.

The record does not support that allegation, as it is based on a blatantly incomplete reading of the evidence cited in its support. *See* [DE 135-38] at 17; [DE 155-3] at 23–24, 87:9-92:7; [DE 155-5] at 24–27, 88:20-104:14; [DE 155-6] at 43–45; [DE 156-4] at 5–6. Instead, the record shows that NHCDC medical staff are thoroughly involved with the care of inmates—whether in or out of fast track. Moreover, as a matter of policy, NHCDC detention officers must comply with medical's directives unless it would jeopardize the safety of the fast track detainee or NHCDC staff Finally, fast track detainees can receive medicine as long as medical staff have been able to complete an assessment ensuring that prescription is medically appropriate.

Because plaintiff's *Monell* claim lacks a factual basis, Defendant Sheriff McMahon is entitled to summary judgment.

**E. <u>Remaining Claims Against Sheriff McMahon</u>**

Defendants move for summary judgment on the claims remaining against Sheriff McMahon: excessive force and violation of due process.

A section 1983 plaintiff must show an individual defendant acted *personally* in the deprivation of the plaintiff's rights secured by the Constitution and laws of the United States. *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). A Section 1983 complaint must contain

> specific allegations of each individual's conduct and state of mind. So too must a plaintiff put forward evidence at summary judgment to support those allegations. At summary judgment, a plaintiff must identify evidence that each individual defendant acted (or failed to act) with a culpable state of mind. Without this defendant-specific evidence, a plaintiff cannot get past summary judgment.

*King v. Riley*, 76 F.4th 259, 269 (4th Cir. 2023) (internal quotations omitted). "It is insufficient to show that subordinates of a sued official deprived plaintiff of his rights, as the doctrine of respondeat superior does not apply to § 1983 cases." *Pevia v. Hogan*, 443 F. Supp. 3d 612, 629–30 (D. Md. 2020) (citing *Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004)).

Plaintiff has proffered no evidence to support a showing that Sheriff McMahon personally participated in the alleged events that occurred on September 28 and 29, 2020. In fact, the record shows Sheriff McMahon was absent from the NHCDC during the time plaintiff was detained there. Accordingly, plaintiff cannot support his excessive force and violation of due process claims against Sheriff McMahon.

## V. <u>CONCLUSION</u>

For the foregoing reasons, the Court GRANTS in their entirety defendants' motions for summary judgment [DE 132; DE 134]; the Court GRANTS defendants' motion to seal [DE 138]; and the Court DENIES AS MOOT plaintiff's corrected motion for sanctions [DE 142]. The Clerk is DIRECTED to close the case.

SO ORDERED, this 25 day of September, 2026.

Terrence Boyle
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE